**Application of John P. GLASS.**
**Patent Appeal No. 8683.**

United States Court of Customs
and Patent Appeals.

March 23, 1972.

John P. Glass, pro se; John F. A. Earley, Philadelphia, Pa., James W. Dent, Washington, D. C., attorneys of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. John W. Dewhirst, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and MALETZ, Judge, United States Customs Court, sitting by designation.

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the rejection, under 35 U.S.C. § 103, of claims 1, 2, and 4–6 of appellant's application [1] entitled "Method of Making Hollow Concrete Panels." Claim 3 has been allowed.

The subject matter of appellant's application (exemplified by Fig. 2 of the drawings hereinafter reproduced) relates to a method of making concrete building panels having hollow portions or chambers therein. The disclosed method involves pouring a lower concrete layer on the bed of a mold, forming troughs in such layer, and, after allowing the concrete to partly settle, placing collapsible mold cores in the troughs. Fig. 2 shows a cross-section of the mold core with the core in open position, ready to be placed on a bottom layer of concrete.

FIG. 2.

[A5481]

----

1. Serial No. 600,300 filed October 14, 1966.

It is stated that the bottoms of the mold cores are sealed by means of tubular rubber seals 47 and 58 to prevent the admission of fresh concrete. An upper layer of concrete is then poured, connecting with the lower layer 101 intermediate the collapsible cores, and the concrete is vibrated to eliminate voids. After the concrete has set and hardened, the mold cores are collapsed and removed from the panels. The collapsing of the cores is effected by the action of a hydraulic jack, assertedly resulting in "peeling" the side walls 21 and 22 and top walls 16 and 17 from the concrete.

Independent claim 1 reads as follows:

1. A method of making hollow concrete panels comprising pouring a lower concrete layer, placing thereon a hollow mold core including a top wall and side walls and an open bottom defined by edges, sealing along the edges of the open bottom to prevent fresh concrete from entering the said open bottom and locking the core in place, pouring an upper concrete layer connecting with said lower layer, allowing the concrete to set, collapsing the core, and removing the core from the concrete.

The remaining claims on appeal, 2 and 4–6, depend from claim 1. Claim 2 adds the limitation that the core is collapsed "by peeling the side and top wall of the core from the concrete." Claim 4 recites that the upper concrete layer is poured prior to completion of the setting of the lower layer, and claim 6 recites the step of vibrating the poured concrete. Claim 5 calls for the step of forming troughs in the lower layer of concrete to accommodate the mold cores.

The references relied on are:

| | | |
|---|---|---|
| Boyle | 857,581 | June 25, 1907 |
| McDougall (Great Britain) | 587,255 | April 18, 1947 |
| Morton (Great Britain) | 601,667 | May 11, 1948 |

Morton discloses a method of making hollow concrete beams which, like appellant's method, involves pouring a first concrete layer in a mold, placing a collapsible mold core thereon, pouring an upper concrete layer, and, after the concrete has set, collapsing and removing the mold core. This is best shown by Figs. 3 and 4.

The core, open at the bottom, comprises sheet metal elements 13 and 14 of sufficient rigidity to retain their general shape under the weight of the concrete. The sheet metal elements are supported upon rails 12 which may be of wood or of other materials including rubber. The well-known practice of vibrating concrete prior to setting is also disclosed.

Boyle utilizes a distensible flexible tube as a core in his method of molding hollow concrete articles. The method includes the forming of a channel or trough in the lower layer of concrete to accommodate the distended core, placing the mold core in the trough formed, pouring an upper concrete layer, and removing the mold core.

McDougall discloses a collapsible core unit with longitudinally hinged members swingable inwardly and outwardly by means of control mechanisms. The device is intended for use in the manufacture of hollow concrete panels.

In his Answer, the examiner rejected the appealed claims, stating that:

Claims 1, 2 and 4–6 are rejected under 35 U.S.C. § 103 as being unpatentable over Boyle or Morton in view of McDougall. Both Boyle and Morton disclose essentially the manipulative steps of the process as that of the appellant's, namely, pouring a layer of concrete, positioning a core on said layer, sealing the bottom of said core,

and pouring another layer on top of said lower layer, and then removing the core. The only apparent difference between the appellant's method and that of the primary references, especially Boyle's, is in the particular type of collapsible core used in such a process. However, McDougall is cited to show a core similar to applicant's that could be used in a method disclosed by Boyle or Morton. McDougall's core is one which has a top wall, side walls and an open bottom. Since the core disclosed by McDougall is one which is to be used in the production of hollow concrete articles, it would be obvious to one of ordinary skill in the art to merely substitute the core shown by McDougall for the core disclosed by Boyle or Morton. Furthermore, the type of core used merely restricts the apparatus used to perform the method and does not restrict the method itself. Morton was also cited to show that it is well known to vibrate the concrete to eliminate voids.

This rejection was affirmed by the board, although it was further of the view that the claims were "unpatentable over the Morton patent alone."

In essence, both the examiner and the board concluded that no differences existed between the subject matter of appellant's claims and the prior art of such substance that the claimed subject matter as a whole would not have been obvious within the purview of 35 U.S.C. § 103. An analysis of claim 1 persuades us that the method steps set forth therein include nothing which could reasonably be considered unobvious from the method disclosed by Morton.

Appellant asserts that a difference between claim 1 and Morton resides in the claimed step of "sealing along the edges of the open bottom" of the mold core; however, claim 1 does not specify how such sealing is to be accomplished. We think it clear that the use of the sheet elements on rails, which may be rubber tubes, results in "sealing along the edges

of the open bottom" for the purpose stated in claim 1.

As the solicitor points out, Morton's rail elements 12 would inherently effect a seal in the same manner as appellant's disclosed sealing means (rubber tube seals 47 and 58). Morton's support rails would clearly provide stress concentrating surfaces. The weight of the core acting against the rail and the surface of the lower concrete layer would, in our view, inherently effect a seal.

Appellant also argues that the wooden rail members of Morton are not perfect and have many holes and grooves and other imperfections and, consequently, "there will be leakage under Morton's wooden members." This argument is purely surmise on appellant's part. It finds no support of record. It should again be pointed out in this connection that Morton expressly suggests that resilient tubular or solid rubber rails may be used in lieu of wooden rails. We think, therefore, that the claimed sealing step would be obvious from this teaching.

Claim 2 adds to the method of claim 1 the requirement that the "core is collapsed by peeling the side and top wall of the core from the concrete." With respect to this claimed step, the examiner noted that all of the references cited disclose cores which are stripped from the mold and that here appellant is claiming only the broad step of peeling, whereas, in allowed claim 3 a particular manner of peeling was set forth. The board observed that:

Much of Appellant's arguments, both written and oral, are directed to the manner in which his core element is "peeled" from the concrete, yet claim 2 is the only claim which refers to this action and it does so broadly as to obviously not patentably differentiate over the Morton disclosure since each of Morton's elements 12, 13 and 14 must be "peeled" from the concrete.

Morton states that his sheet metal core elements rest in an unbalanced

state so that upon being detached they tend to fall apart at the overlap. It is further stated that the elements may be knocked out of position if they do not "fall away unassisted." Examination of the Morton disclosure supports the conclusion that his elements would separate from the concrete first at their point of overlap, as seen in Fig. 4 reproduced above, and continue progressively to separate toward the support rails. This would be true whether the elements fall loose or are knocked or jarred loose. In short, we find in Morton a teaching of the peeling facet embraced in appellant's claim 2.

Appellant argues that Morton's core elements are not collapsible by "peeling" because of their rigidity. As heretofore noted, Morton's sheet core elements are only sufficiently rigid to retain their general shape under the weight of the concrete. There is no element which reinforces or stiffens them in any way throughout their length. Appellant's specification, on the other hand, discloses that top wall units 16 and 17 which form his core include top walls having U-shaped sheet metal members welded thereto, additional stiffening being provided by webs and bulkheads at spaced intervals. The specification notes that such construction is preferable so as to obtain torsional rigidity. It is to be noted also that the side wall units 21, 22 are made up of U-shaped sheet metal members stiffened along their length by strengthening gussets. These noted features in appellant's disclosure would seem to indicate that Morton's core elements must be at least as readily separated from the concrete by "peeling" as appellant's core units.

We have analyzed the limitations added to the subject matter of claim 1 by dependent claims 4–6 and conclude that they afford no basis for a finding of unobviousness. The additional features recited in these claims are suggested by the references of record and have not been shown to yield any unexpected results.

With reference to claims 4 and 6, the board properly noted that they recited, respectively, the conventional practices, illustrated by the art of record, of pouring a second layer of concrete prior to completion of setting of a first layer, and vibrating the poured concrete to eliminate voids. Claim 5 recites mounds on the first layer of concrete to form a trough for a mold core. As pointed out by the board, this step is clearly taught by Boyle.

Upon our review of the record, the cases cited and consideration of the arguments of counsel, we find no reversible error in the decision of the board, which is accordingly affirmed.

Affirmed.